**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHRISTOPHER MARINO; JOSHUA E. HARDIN; KRISTEN J. HARDIN, *Plaintiffs-Appellants*, <br><br> v. <br><br> OCWEN LOAN SERVICING LLC, *Defendant-Appellee.* | No. 19-15530 <br><br> D.C. No. 3:16-cv-00200- MMD-WGC <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted February 7, 2020
San Francisco, California

Filed October 20, 2020

Before: Richard A. Paez and Carlos T. Bea, Circuit Judges,
and Lynn S. Adelman,[*] District Judge.

Opinion by Judge Adelman;
Concurrence by Judge Bea

---

[*] The Honorable Lynn S. Adelman, United States District Judge for the Eastern District of Wisconsin, sitting by designation.

# SUMMARY[**]

## Fair Credit Reporting Act

The panel affirmed the district court's summary judgment in favor of the defendant in an action alleging a violation of the Fair Credit Reporting Act's prohibition against obtaining a consumer credit report without a permissible purpose.

Plaintiffs alleged that defendant Ocwen Loan Servicing, LLC, willfully violated the FCRA when it obtained credit reports about consumers whose mortgage loans had been discharged in bankruptcy. The district court did not consider whether Ocwen's conduct amounted to a violation of the FCRA. Rather, it found that, as a matter of law, any violation by Ocwen could not have been willful; thus, plaintiffs could not recover statutory or punitive damages.

The panel held that, to show that a violation was willful, a plaintiff must show that the defendant either knowingly violated the FCRA or recklessly disregarded the Act's requirements. Ocwen argued that because the liens on the plaintiffs' homes survived their bankruptcies, and because the plaintiffs continued to hold title to their homes, Ocwen and the plaintiffs continued to have credit relationships that justified Ocwen's periodic review of their credit reports. Among other FCRA provisions, Ocwen cited 15 U.S.C. § 1681b(a)(3)(A), which provides that a consumer report may be obtained when the user "intends to use the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

information in connection with a credit transaction involving the consumer on whom the report is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer."

First, for the purpose of preventing the law in the area from stagnating, the panel considered whether Ocwen committed violations of the FCRA. Analogizing to the field of qualified immunity, the panel stressed that courts should be reluctant to skip the threshold question of whether a defendant violated the FCRA. The panel concluded that Ocwen was permitted under § 1681b(a)(3)(A) to review the plaintiffs' accounts and credit reports to determine whether it could offer them alternatives to foreclosure, and it therefore did not violate the Act.

Second, the panel agreed with the district court that Ocwen did not willfully violate the FCRA.

Judge Bea concurred in the result and in the reasoning on which that decision was based: to affirm the district court's grant of summary judgment because plaintiffs did not raise a triable issue of fact as to whether Ocwen recklessly or willfully violated the FCRA. Judge Bea wrote that he would not include discussion of whether Ocwen's conduct constituted a statutory violation.

## COUNSEL

Scott C. Borison (argued), Legg Law Firm LLP, San Mateo, California; Peter A. Holland, Holland Law Firm P.C., Annapolis, Maryland; for Plaintiffs-Appellants.

John Lynch (argued), Troutman Sanders LLP, Virginia Beach, Virginia; Harrison S. Kelly and Michael E. Lacy, Troutman Sanders LLP, Richmond, Virginia; Gary E. Schnitzer, Kravitz Schnitzer Sloane and Johnson, Las Vegas, Nevada; for Defendant-Appellee.

## OPINION

ADELMAN, District Judge:

The Fair Credit Reporting Act ("FCRA") forbids a person from obtaining a consumer credit report without a permissible purpose. *See* 15 U.S.C. § 1681b(f)(1). But a creditor who violates this provision is not necessarily liable to the consumer. Under the FCRA, only negligent or willful violations are actionable; a consumer may recover compensatory damages for negligent violations and statutory and punitive damages for willful violations. *See* 15 U.S.C. §§ 1681n, 1681*o*. In the present case, the plaintiffs allege that defendant Ocwen Loan Servicing LLC willfully violated the FCRA when it obtained credit reports about consumers whose mortgage loans had been discharged in bankruptcy. The district court granted summary judgment to Ocwen, finding that, as a matter of law, any violation by Ocwen could not have been willful. We affirm. However, we also stress that, to prevent the law in this area from stagnating, courts should be reluctant to skip to the negligence or willfulness issue without answering the threshold question of whether the defendant violated the FCRA.

## I.

Ocwen is a servicer of mortgage loans. Plaintiffs Christopher Marino and Josh and Kristin Hardin owned

homes subject to mortgages serviced by Ocwen. Each plaintiff filed for bankruptcy and received a discharge of his or her personal liability for the mortgage debt. However, the liens on the plaintiffs' homes survived their bankruptcies, and the plaintiffs continued to hold title to the properties. Following the discharges, Ocwen obtained the plaintiffs' credit reports. In the district court, the plaintiffs alleged that, in light of the discharges, Ocwen could not have had permissible reasons to obtain their reports. The plaintiffs further alleged that, by obtaining the reports without permissible reasons, Ocwen willfully violated the FCRA and therefore was liable for statutory and punitive damages.

Under the FCRA, to show that a violation was willful, a plaintiff must show that the defendant either knowingly violated the Act or recklessly disregarded the Act's requirements. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007). To show that a defendant recklessly disregarded the Act's requirements, a plaintiff must show that the defendant "ran a risk of violating the law substantially greater than the risk associated with a reading [of the Act] that was merely careless." *Id.*

Ocwen moved for summary judgment. It argued that because the liens on the plaintiffs' homes survived their bankruptcies, and because the plaintiffs continued to hold title to their homes, Ocwen and the plaintiffs continued to have credit relationships that justified Ocwen's periodic review of their credit reports. Ocwen cited several provisions of the FCRA in support of its claim that it had a permissible purpose to obtain the reports. *See* 15 U.S.C. § 1681b(a)(3)(A), (E) & (F). For purposes of this appeal, we will focus on only one of these provisions, which appears in subsection (a)(3)(A). It provides that a consumer report may be obtained when the user "intends to use the information in

connection with a credit transaction involving the consumer on whom the report is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." 15 U.S.C. § 1681b(a)(3)(A).

In deciding the motion for summary judgment, the district court relied primarily on this court's unpublished opinion in *Vanamann v. Nationstar Mortgage, LLC*, 735 F. App'x 260 (9th Cir. 2018). In *Vanamann*, the plaintiff alleged that Nationstar, a mortgage servicer, willfully violated the FCRA by obtaining credit reports about her after her mortgage debt had been discharged in bankruptcy. For purposes of the appeal, we "assum[ed] that Nationstar lacked a permissible purpose for checking [the plaintiff's] credit" *Id.* at 262. But we concluded that the district court had properly granted Nationstar's motion for summary judgment because the plaintiff could not show that any violation was willful. *Id.* In this regard, we reasoned that Nationstar could have reasonably believed that it had a permissible purpose for obtaining the plaintiff's credit report. We wrote:

> The Act contains no provision addressing bankruptcy discharges for Nationstar to interpret, much less interpret recklessly. The plain text of the Act does not prohibit a mortgage servicer from obtaining a consumer's credit report after a bankruptcy court's discharge of the consumer's mortgage debt. Nor have we interpreted the Act to prohibit that practice. And the Act does not require that a consumer have personal liability on a debt in order for a credit check to be authorized. The provision authorizing credit checks for "review . . . of an account" "in connection with a credit transaction"—

> however broad or narrow that provision may
> be—permits Nationstar's interpretation.

*Id.* Based on *Vanamann*, the district court concluded that
Ocwen could not have willfully violated the FCRA.

On appeal, the plaintiffs contend that summary judgment
on the question of willfulness was improper as to them[1]
because they "surrendered and vacated" the mortgaged
premises before Ocwen obtained their credit reports. They
contend that, because they no longer lived in the homes and
their personal liability for the mortgage debts had been
discharged, Ocwen couldn't possibly have had legitimate
reasons to continue reviewing their credit reports. In
response to this argument, Ocwen points to several reasons
for continuing to review the plaintiffs' credit, including to
determine whether the plaintiffs were eligible for
alternatives to foreclosure or other "loss mitigation
opportunities." Ocwen also contends that, even if its belief
that it had permissible reasons to check the plaintiffs' credit
was mistaken, it was not based on a reckless interpretation
of the statute or an intentional misreading of the statute.
Therefore, Ocwen contends, the district court properly
granted summary judgment on the issue of willfulness.

## II.

We review the district court's grant of summary
judgment de novo. *See Carson Harbro Village Ltd. v.*

---

[1] In the district court, there were eight plaintiffs, and those eight
plaintiffs sought to represent a class of similarly situated mortgagors.
However, only three plaintiffs have appealed, and they no longer seek to
represent a class. Thus, the only issue on appeal is whether the district
court properly granted summary judgment on the claims of the three
plaintiffs-appellants.

*Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001). Summary judgment is appropriate when, based on the evidence in the record, no reasonable fact finder could return a verdict for the nonmoving party. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).

Because the plaintiffs seek only statutory and punitive damages, to avoid summary judgment, they must show that their evidence permitted a reasonable fact finder to reach two conclusions: (1) that Ocwen's post-discharge credit inquiries violated the FCRA, and (2) that Ocwen's violations were willful. The district court addressed only the willfulness issue. It did not separately consider whether Ocwen's conduct amounted to a violation of the FCRA.

We agree with the district court that the plaintiffs cannot show that a reasonable fact finder could conclude that Ocwen's alleged violations were willful. But before we turn to the willfulness issue, we pause to consider whether Ocwen committed violations of the FCRA in the first place. We do this is to prevent the law in this area from stagnating. As we noted above, a consumer may succeed on a claim under the FCRA only if he or she shows that the defendant's violation was negligent or willful. *See* 15 U.S.C. §§ 1681n, 1681*o*. To prove a negligent violation, a plaintiff must show that the defendant acted pursuant to an objectively unreasonable interpretation of the statute. *See Syed v. M-I LLC*, 853 F.3d 492, 505 (9th Cir. 2017). To prove a willful violation, a plaintiff must show not only that the defendant's interpretation was objectively unreasonable, but also that the defendant ran a risk of violating the statute that was substantially greater than the risk associated with a reading that was merely careless. *Safeco*, 551 U.S. at 69. Under either the negligence or willfulness standard, when the applicable language of the FCRA is "less than pellucid," *id.*

at 70, a defendant will nearly always avoid liability so long as an appellate court has not already interpreted that language. Thus, in nearly every case involving unclear statutory language, an appellate court may dispose of the appeal by concluding that the defendant did not negligently or willfully violate the statute. But if the appellate court addresses only the negligence or willfulness issue and leaves the question of statutory interpretation undecided, then the question of statutory interpretation will likely never be answered.

The problem is analogous to the problem in the field of qualified immunity that led the Supreme Court, for a time, to require that courts first determine whether a plaintiff had suffered a violation of a constitutional right before making the oft-dispositive determination of whether that right was clearly established at the time of the misconduct. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although this two-step sequence is no longer mandatory, *see Pearson v. Callahan*, 555 U.S. 223, 232 (2009), the Court continues to recognize that it is often beneficial because it "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," *id.* at 236. Similarly, here, addressing whether the defendant violated the FCRA before turning to the issues of negligence or willfulness promotes the development of precedent on questions of statutory interpretation that do not frequently arise in cases in which issues of negligence or willfulness are absent. We note that the Supreme Court implicitly endorsed this approach by following it in *Safeco*— the case in which it interpreted the FCRA's willfulness standard. The Court first answered the "antecedent question" of statutory interpretation that applied to the case. 551 U.S.

at 60–67.  Only then did it address whether the defendants' alleged violations were willful. *Id.* at 67–70.**[2]**

For these reasons, we encourage courts in this circuit to determine whether the defendant committed a violation of the FCRA before turning to questions of negligence and willfulness. However, this is not an ironclad rule, and circumstances may arise where the issues of negligence or willfulness should be resolved first. For example, the factual record might not be sufficiently developed to enable the court to determine whether the defendant committed an FCRA violation, but the court might still be able to determine that any violation that occurred could not have been negligent or willful. The important point is that, when feasible, courts should resolve disputed issues of statutory interpretation before disposing of the case for lack of a negligent or willful violation.

## A.

We thus turn to the antecedent question of whether the plaintiffs have demonstrated that Ocwen lacked a permissible purpose for obtaining their credit reports after their mortgage debts had been discharged. The plaintiffs contend that they have shown this (or at least demonstrated the existence of a genuine factual dispute) because, following their discharges, Ocwen could do nothing except

---

**[2]** Technically, the Court did not determine whether one of the defendants, Safeco, violated the FCRA, but instead disposed of the claim against it on willfulness grounds. However, that was only because the factual record did not permit the Court to determine whether, under the Court's interpretation of the disputed FCRA provision, Safeco committed a violation. *See Safeco*, 551 U.S. at 68, 71. The Court still answered the question of statutory interpretation that was antecedent to the willfulness inquiry. *See id.* at 60–67.

foreclose its liens, and therefore Ocwen had no legitimate use for the plaintiffs' credit reports, which were not relevant to foreclosure.

We think the plaintiffs' argument falters at the very first step, for they have not shown that, at the time Ocwen obtained their credit reports, Ocwen could do nothing except foreclose its liens. Although the plaintiffs' personal liability for the mortgage debts had been discharged, Ocwen was not prohibited from inquiring whether the plaintiffs wished to explore alternatives to foreclosure, such as entering into a new loan on different terms or a payment plan that might allow the plaintiffs to keep their homes. Indeed, the discharge provisions of the bankruptcy code state that the discharge injunction does not apply to a secured creditor's efforts to seek "periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien." *See* 11 U.S.C. § 524(j)(3). Along with its motion for summary judgment, Ocwen filed a declaration in which it explained that one of the reasons it reviewed the plaintiffs' credit reports was to determine whether the plaintiffs were eligible for one of these alternatives to foreclosure. Ocwen explained that it sought to evaluate the plaintiffs "for loss mitigation options, such as loan modification, HAMP [i.e., the federal government's Home Affordable Modification Program], short sale, deed-in-lieu of foreclosure, second mortgage, and cash-for keys." Decl. of Derrick Raleigh ¶ 30.

The plaintiffs do not contend that evaluating a debtor for alternatives to foreclosure is not a permissible reason for obtaining a credit report under § 1681b(a)(3). And it seems clear to us that using a credit report for this purpose fits within the scope of § 1681b(a)(3)(A): it is using the information "in connection with a credit transaction involving the consumer . . . and involving the extension of

credit to, or review or collection of an account of, the consumer." Obviously, mortgage debt is the product of a credit transaction, and that debt survived the plaintiffs' bankruptcies, at least to the extent of the value of the collateral. Ocwen's exploring alternatives to foreclosure would have been part of a review of, or an attempt to collect, the account associated with the surviving lien.

The plaintiffs seem to offer two responses to Ocwen's claim that it could permissibly use the information in the credit reports to evaluate them for alternatives to foreclosure. First, the plaintiffs assert that, following their discharges, they never expressed interest in alternatives to foreclosure. But we fail to see why this should matter. In evaluating the plaintiffs for eligibility for alternatives to foreclosure, Ocwen would have been reviewing the plaintiffs' outstanding accounts and attempting to collect the value of the collateral, which it was permitted to do even after the plaintiffs received discharges. Thus, even if the plaintiffs did not request alternatives to foreclosure, Ocwen could have explored those options and, if the plaintiffs qualified for an alternative, presented them with an offer in lieu of foreclosure. Nothing in § 1681b(a)(3)(A) suggests that a consumer must request an alternative to foreclosure before the creditor may review the consumer's account to determine whether he or she is eligible.

Second, the plaintiffs claim that, by the time Ocwen obtained their credit reports, they had "surrendered and vacated" their properties. Here, however, we note that the plaintiffs do not explain what they mean by "surrendered," and that they have pointed to no evidence in the record from which a finder of fact could conclude that the plaintiffs vacated their properties before Ocwen obtained their credit reports. In any event, we will assume that the plaintiffs

vacated their homes. We will also assume that, by "surrendered," the plaintiffs mean that they expressed no interest in contesting or avoiding foreclosure. Still, it does not follow that Ocwen did not have a reason to review their accounts to determine if they qualified for alternatives to foreclosure. Ocwen could have reasonably thought that even a debtor that moved out of his or her home might be interested in returning if Ocwen made a sufficiently attractive offer. Thus, Ocwen was permitted to review the plaintiffs' accounts—and their credit reports—to determine whether it could offer them alternatives to foreclosure.

In reaching this conclusion, we do not mean to suggest that there is never a point at which a mortgage servicer or lender will lack a permissible purpose to review the credit report of a consumer whose mortgage debt has been discharged. We imagine that if a consumer clearly informs the servicer or lender that he or she has no interest in avoiding foreclosure, then the servicer or lender might lack a permissible purpose for continuing to review the consumer's credit. But to resolve this case, we do not need to identify the precise point at which review of the consumer's credit must stop. All we hold is that, based on the evidence in the summary judgment record, a reasonable finder of fact could not conclude that Ocwen lacked a permissible purpose for obtaining the plaintiff's credit reports.

## B.

Because we conclude that the plaintiffs have not shown that Ocwen violated the FCRA, the issue of willfulness is essentially moot. However, for the sake of completeness, and at the risk of stating the obvious, we note our agreement with the district court that Ocwen did not willfully violate the FCRA. Because we have interpreted the FCRA to mean

what Ocwen thought it means, Ocwen could not have intentionally or recklessly misinterpreted the Act.

## III.

The district court's grant of summary judgment to Ocwen is **AFFIRMED.**

---

BEA, Circuit Judge, concurring:

I concur in the result and in the reasoning on which that decision is based: to affirm the district court's grant of summary judgment because Plaintiffs, who seek statutory and punitive, but not compensatory, damages, did not adduce evidence sufficient to raise a triable issue of fact as to the material issue—whether Ocwen recklessly or willfully violated the FCRA.

I concur separately because I would not include discussion of two matters not essential to the determination of this case. First, the majority decides that under two set of facts Plaintiffs—one supported by the record and one Plaintiffs argued but did not prove—Ocwen's conduct did not constitute a statutory violation of the FCRA, a question which is not relevant to the decision of the case before us.[1]

---

[1] The majority discusses Plaintiffs' two arguments: that Ocwen was not permitted to pull their credit reports because it had no need to evaluate their credit since (i) Plaintiffs never expressed interest in alternatives to foreclosure; and (ii) Plaintiffs "surrendered and vacated" their properties before Ocwen obtained their credit reports, though Plaintiffs did not provide any record evidence to support this argument. Op. at 12–13. The majority decides "Ocwen was permitted to review the

Second, the majority imagines a hypothetical, which Plaintiffs did not plead nor prove, that the majority states may constitute a statutory violation of the FCRA.[2]

First, the issue of whether there may have been a statutory violation of the FCRA is not necessary or relevant to the decision of the case before us.  So, none of the scenarios, neither the two argued by Plaintiffs nor the one imagined by the majority, are related to the basis on which *this* case was decided, whether Ocwen's conduct constituted a reckless or willful violation of the FCRA.

Second, the majority states that "when the applicable language of the FCRA is less than pellucid, a defendant will nearly always avoid liability so long as an appellate court has not already interpreted that language."  Op. at 8–9 (internal quotation marks and citation omitted).  However, the majority has not identified what precise language of the FCRA is not "pellucid" but needs an appellate court's statutory interpretation.  Neither has the majority explained how the language could be made "pellucid."  Further, when the majority describes a hypothetical scenario and suggests a possible conclusion about whether the conduct in that hypothetical would violate the FCRA, it is not an exercise in statutory interpretation in this case.  It seems a roadmap for plaintiff counsel in a hoped-for future lawsuit.  It is the application of the statute in the present case to a hypothetical case.  Ironically, the majority's confidence in suggesting a

---

plaintiffs' accounts—and their credit reports—to determine whether it could offer them alternatives to foreclosure."  Op. at 13.

[2] "We imagine that if a consumer clearly informs the servicer or lender that he or she has no interest in avoiding foreclosure, then the servicer or lender might lack a permissible purpose for continuing to review the consumer's credit."  Op. at 13.

conclusion to a hypothetical illustrates quite plainly that it *does* find the statute's language "pellucid"; clear enough that a court would be able to determine whether a plaintiff may recover in that different factual scenario.

Third, the majority notes that the statute does not give plaintiffs many opportunities to recover, so defendants "will nearly always avoid liability". This is not an indication of a "stagnant" statute, but rather one with clear requirements that may be difficult for a plaintiff to meet and establish by proof. The majority may think the drafters of the statute did an incomplete job or should state a better policy, but courts should resist the temptation to publish unrequested advice to Congress. I do not think it is the task of the court to give guidance to the industry or the Bar or to ensure the law does not "stagnate" by way of dicta. Nor is it a particularly good idea. Congress is elected to do so. We are appointed to decide "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1. "[I]f it is not necessary to decide more, it is necessary not to decide more." *PDK Labs., Inc. v. Drug Enforcement Admin.*, 362 F.3d 786, 799 (C.A.D.C. 2004) (Roberts, J., concurring in part and concurring in judgment).

Fourth, the majority cites *Vanamann v. Nationstar Mortgage, LLC*, 735 F. App'x 260 (9th Cir. 2018), and decides this case with similar reasoning, but it does not follow *Vanamann*'s short, direct path from issue to statute to application to conclusion. Instead, the majority discusses and decides what it terms "the antecedent question" of statutory violation for award of compensable damages—a question not necessary to decide in this case because Plaintiffs sought only statutory and punitive damages—and it encourages other courts in this circuit to do the same. Op. at 9–10. It cites the Supreme Court's decisions in *Saucier v.*

*Katz*, 533 U.S. 194 (2001) and *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) to support this approach.  Op. at 9–10.

In *Saucier*, the Court employed a two-step approach to decide the qualified immunity issue, first deciding whether an official's conduct violated a constitutional right and then whether that right was clearly established.  *Saucier*, 533 U.S. at 201.  The Court's approach in *Saucier* does not provide support for the majority's approach in this case for two reasons: analysis of the first question may have assisted the Court in deciding the second question; and the Court analyzed provisions of the Constitution, not statutory language such as the FCRA.

The Court stated one reason for its approach in *Saucier* is that analysis of the first question may inform the analysis of the second question.  *Saucier*, 533 U.S. at 201 ("In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.").  The majority here does not contend that analysis of statutory violation of the FCRA will ever inform analysis of whether the violation was done recklessly or willfully.  *Vanamann* provides a useful model and assumes the conduct violated the FCRA and then decides the case, as we have here, based on lack of evidence of recklessness or willfulness.

The majority notes the Court applied a similar approach interpreting the FCRA in *Safeco*.  The text of the statute the Court found "less-than-pellucid" in *Safeco* was quite different from the text involved here.  In *Safeco*, the text involved whether a customer must be notified when the rate an insurance company quoted the customer was adversely affected by the contents of the customer's credit report.  *Safeco*, 551 U.S. at 53 (discussing 15 U.S.C. § 1681m (a),

which requires notice of an adverse action based on information in a credit report; and 15 U.S.C. § 1681a(k)(1)(B)(i), which defines "adverse action"). In contrast, here the issue is whether Ocwen is permitted to obtain a customer's credit report pursuant to 15 U.S.C. § 1681b(a)(3)(A), not what the entity must do if the credit report adversely affects the rate it quotes the customer. The *Safeco* Court did not find this language regarding obtaining a credit report to be "less than pellucid" and in need of any type of interpretation, simply because the statutory language involved here was not involved in *Safeco*.

The majority cites *Safeco* for the proposition that the Court first answered the "antecedent question" of violation of the Act before it went to the issue of whether there was willfulness. In *Safeco*, the Court found that GEICO had not violated the FCRA because it had not taken adverse action and so had not been required to give notice. *Safeco*, 551 U.S. at 67–68. The Court found that SAFECO had probably violated the FCRA by a mistaken reading of the Act, but that this mistaken reading was at worst careless, and certainly not willful, as those concepts were developed at common law and incorporated in the FCRA. *Id*. In neither case, did the Court concern itself with whether the law was "stagnating", as the Opinion puts it, if plaintiffs' claims were denied, as does the Opinion. Op. at 9 ("Thus, in nearly every case involving unclear statutory language, an appellate court may dispose of the appeal by concluding the defendant did not negligently or willfully violate the statute."). In neither case did the Court lay out a hypothetical, through an effort of "development of precedent", (Op. at 9), to provide a roadmap to potential plaintiffs.

The citation of *Saucier v. Katz* is inapposite as a basis for the "development of precedent" on questions of statutory

interpretation. *Saucier* was dealing with what *constitutional* rights existed and were *clearly established* enough to deprive state actors of Qualified Immunity as a defense. *Saucier*, 533 U.S. at 197. What are *constitutional* rights in concrete situations, based on such indeterminate concepts as Due Process and Equal Protection, are apt for development by precedent. What are *statutory* rights should be determined by Congress.

But *Saucier v. Katz* is inapposite for a different reason: it has been modified by *Pearson v. Callaghan* so that most, if not all, claims of violations of constitutional rights are these days determined by application of Qualified Immunity, inhibiting somewhat the creation of novel constitutional rights.

The majority states its purpose in employing this approach is to "promote[] the development of precedent on questions of statutory interpretation." Op. at 9. There are two reasons to reject the majority's approach. First, I fail to see how the majority opinion develops precedent on how to accomplish statutory interpretation. Beside no citation to the language of the statute which is claimed to be "less than pellucid" there is no mention of which, if any, canons of statutory interpretation are to be used. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9, 104 S. Ct. 2778, 2782 n.9, 81 L. Ed. 2d 694 (1984) ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."). Second, laying out a roadmap of how plaintiffs might prevail in a hypothetical case, not yet decided, is not precedent on how the FRCA should be interpreted.

It is particularly inadvisable to decide an unrelated issue or a hypothetical case not presently before the court in the

Ninth Circuit, where dicta in panel opinions may become the binding law of the circuit. *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) ("We hold, instead, that where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense."). Perhaps the *Johnson* rule as to adoption of dicta as precedent given "reasoned consideration" does not apply to the hypothetical suggested by the majority as a possible occasion of plaintiff recovery, because the majority was not "confront[ing] an issue germane to the eventual resolution of the case." But rather than foment claims and arguments as to whether the majority's dicta gave "reasoned consideration" to an issue, or whether the posited hypothetical was "germane" to eventual resolution of *this* case, it would be better to edit out that hypothetical.

Reticence to expatiate in dicta is always advisable.